2020 UT App 90

# THE UTAH COURT OF APPEALS

BLACK DIAMOND FINANCIAL LLC,
Appellant and Cross-appellee,

*v.*

BIG COTTONWOOD PINE TREE WATER COMPANY,
Appellee and Cross-appellant, and
VICKI KINCAID,
Appellee.

Opinion
No. 20190237-CA
Filed June 11, 2020

Third District Court, Salt Lake Department
The Honorable Keith A. Kelly
No. 160903434

Erik A. Olson and Kevin Paulsen, Attorneys for
Appellant and Cross-appellee

John A. Snow and Alex B. Leeman, Attorneys for
Appellee and Cross-appellant Big Cottonwood Pine
Tree Water Company

Michael F. Skolnick and Jeremy Speckhals, Attorneys
for Appellee Vicki Kincaid

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES DAVID N. MORTENSEN and DIANA HAGEN
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1      Black Diamond Financial LLC (Black Diamond) appeals the district court's grant of summary judgment in favor of Vicki Kincaid, its grant of Big Cottonwood Pine Tree Water Company's (Big Cottonwood) motion to strike Black Diamond's supplemental disclosures, and its grant of summary judgment in favor of Big Cottonwood on the issue of damages. We affirm.

BACKGROUND

¶2     In the 1980s, the Pine Tree subdivision was built in Big Cottonwood Canyon. Big Cottonwood is a nonprofit corporation responsible for administering water rights to shareholders living in Pine Tree. The water is supplied by Salt Lake City Corporation pursuant to a Water Supply Permit and Agreement entered in 1984.

¶3     When Big Cottonwood was established, its bylaws stated that each lot-owner, or "member," would be issued a share of stock that would entitle them to connect only their own cabin to the main water line. The member's lot number was to "be specified on the share certificate" and was to "be transferable only at such time as said lot is transferred and only to the transferee or transferees of said lot." If a share certificate was surrendered for transfer, Big Cottonwood was to cancel the certificate and issue a new one, but it was not permitted to issue a new certificate "until the former certificate for a like number of shares shall have been surrendered and cancelled." The bylaws further provided that shares are "not transferrable to another lot" and that "if [a] member, at the time of transfer of [a] lot, does not transfer the share to the transferee of the lot, ownership of the share shall automatically revert to" Big Cottonwood, which would "hold the share for the benefit of the transferee or subsequent transferee of said lot." As a matter of practice, Big Cottonwood "did not implement any system for checking the title of a particular lot when it was asked to issue a new water share stock certificate" but instead "simply assumed that the person asking for the new water share also had an interest in the property."

¶4     In 2005, Steven Rollins obtained Lot 25 in Pine Tree, along with its water share, represented by Share Certificate No. 59. Between 2003 and 2009, Rollins and the previous owners of Lot 25 paid Big Cottonwood assessments on the water share and used the water. At the time he purchased Lot 25, Rollins was in a relationship with Kincaid. Rollins borrowed money from

Kincaid to remodel the property and promised to repay her out of the proceeds when the property was sold. When Rollins was unable to sell the property for a satisfactory price, he entered into a new agreement with Kincaid in which he agreed, among other things, to transfer his water share to her in exchange for forgiving the loan. At the time, "both Rollins and Kincaid . . . were unaware of the provisions of [Big Cottonwood's] Articles and Bylaws that prohibited Rollins from conveying to Kincaid his share of [Big Cottonwood] stock unless he also conveyed to her title to Lot 25."

¶5     Rollins signed the water share for Lot 25 over to Kincaid, and she asked Big Cottonwood to issue a new share in her name. After Kincaid paid a processing fee, Big Cottonwood canceled Rollins's Share Certificate No. 59 and issued Share Certificate No. 63 to Kincaid.

¶6     In 2011, Rollins's lender foreclosed on Lot 25. The lender began marketing the property but was soon informed that the water share had previously been transferred to Kincaid and that Lot 25 therefore had no water service. In 2013, Black Diamond expressed interest in purchasing Lot 25. The real estate agent "informed Black Diamond that the property did not come with water, but Black Diamond pursued the matter anyway, hoping to get the property for a much lower price." Black Diamond believed that it could obtain water from another source but also had a "'common sense' understanding . . . that water shares in the Pine Tree Subdivision 'had to stay' with the land" so that if it "became the owner of the lot it would have some right to the water."

¶7     After failing to obtain water through other means, Black Diamond sued Big Cottonwood and Kincaid, (1) seeking a declaratory judgment that Rollins's transfer of the water share to Kincaid was void, that the share automatically reverted back to Big Cottonwood upon the attempted transfer, and that Big Cottonwood must issue the share to Black Diamond; (2) asserting that Big Cottonwood breached its articles and bylaws

and its duty of good faith by issuing Share Certificate No. 63 to Kincaid and that Black Diamond, as a third-party beneficiary of the contract, suffered losses as a result; and (3) asserting that Kincaid intentionally interfered with Black Diamond's potential economic relationships by refusing to transfer her water share to Black Diamond.

¶8 Black Diamond provided initial disclosures in which it stated that it had not yet calculated its damages. The disclosures asserted that one of Black Diamond's intended witnesses, its principal Brandon Wixom, would testify regarding damages. When deposed, Wixom was asked how he had been damaged. He responded, "I cannot occupy and use the property. I cannot rent the property. Several ways we have been damaged . . . . I cannot market the property to sell. . . . Quiet enjoyment, use all the privileges that a landowner should have, I am unable to have." When asked more specifically how he would calculate damages, he responded that "it could be done very easily" based on "lack of rent for . . . X amount per month, over the time that it's been unable to be rented."

¶9 Kincaid moved for summary judgment on the ground that she was a protected purchaser under Utah Code section 70A-8-303. Black Diamond and Big Cottonwood filed cross motions for partial summary judgment on Black Diamond's breach of contract claim. The district court granted summary judgment in favor of Kincaid on Black Diamond's claims against her because it agreed with Kincaid that she was a protected purchaser. On the other hand, the district court granted summary judgment in favor of Black Diamond on the breach of contract issue, concluding that Black Diamond was a third-party beneficiary under the bylaws, that Big Cottonwood had breached the bylaws, and that Big Cottonwood was therefore liable for any damages caused by the breach. The court determined that specific performance was not available because Kincaid was a protected purchaser but left open the question of what damages Black Diamond sustained as a result of the breach of contract.

¶10 Following the court's ruling on summary judgment and after the close of fact discovery, Black Diamond served supplemental disclosures on Big Cottonwood, which included a new theory and computation of damages based on the devaluation of Lot 25 caused by the property's lack of access to water. Big Cottonwood moved to strike the supplemental disclosures as untimely, asserting that the only method of calculating damages that Black Diamond had ever provided was Wixom's deposition statement that he would calculate damages based on "lack of rent for . . . X amount per month, over the time that it's been unable to be rented." The district court granted Big Cottonwood's motion to strike and limited Black Diamond's argument and presentation of evidence of damages to "lost rental value of the subject property."[1]

¶11 After completing expert discovery, Big Cottonwood moved for summary judgment on the issue of damages, asserting that Black Diamond had "suffered no recoverable damages." The district court granted Big Cottonwood's motion, concluding that Black Diamond sustained "no actual harm . . . because the lack of water for Lot 25 was factored into the purchase price." Further, the district court concluded that Black Diamond, having purchased Lot 25 knowing that it did not have access to water, should have known "that Lot 25 was not rentable without water" and could not have expected to "be able to rent the property and generate rental income." Because Black Diamond could not establish that it had suffered damage, the district court granted Big Cottonwood's motion for summary judgment and "awarded nominal damages in the amount of

---

1. We question whether the vague lost rent calculation provided by Wixom in his deposition was sufficient to fulfill the disclosure requirements of rule 26 of the Utah Rules of Civil Procedure. However, since Big Cottonwood conceded that the court could consider the lost rental value, we assume for purposes of our decision that the disclosure was sufficient.

$1.00" based on Big Cottonwood's "breach of its bylaws." Black Diamond now appeals.

ISSUES AND STANDARDS OF REVIEW

¶12    Black Diamond first argues that the district court erred in granting summary judgment in favor of Kincaid on the issue of whether she was a protected purchaser under the Utah Uniform Commercial Code. "Because a district court's ruling on summary judgment is a question of law, we review it for correctness." *Rupp v. Moffo*, 2015 UT 71, ¶ 5, 358 P.3d 1060.

¶13    Next, Black Diamond asserts that the district court erred in striking the supplemental disclosures it filed to supplement its computation of damages against Big Cottonwood. "While interpretations of the Utah Rules of Civil Procedure are questions of law reviewed for correctness, we recognize that trial courts have a great deal of deference in matters of discovery." *Arreguin-Leon v. Hadco Constr. LLC*, 2018 UT App 225, ¶ 15, 438 P.3d 25 (quotation simplified), *cert. granted*, 455 P.3d 1055 (Utah 2019). "We therefore review discovery orders for abuse of discretion and will not find abuse of discretion absent an erroneous conclusion of law or where there is no evidentiary basis for the trial court's ruling." *Id.* (quotation simplified).

¶14    Finally, Black Diamond argues that the district court erred in determining as a matter of law that it had failed to establish any recoverable damages and was entitled only to nominal damages. Again, we review the district court's summary judgment ruling for correctness. *Rupp*, 2015 UT 71, ¶ 5.[2]

---

2. Big Cottonwood raised additional issues on cross-appeal. However, Big Cottonwood asks us to address these issues only if we "determine[] to reverse the judgment entered by the district court." Because we affirm the district court's ruling on appeal,

(continued…)

ANALYSIS

I. Kincaid Was a Protected Purchaser

¶15 Black Diamond first argues that the district court erred in concluding that Kincaid was a protected purchaser under Utah Code section 70A-8-303. A protected purchaser acquires "the rights of a purchaser" as well as "the purchaser's interest in the . . . share of stock in a water company free of any adverse claim." Utah Code Ann. § 70A-8-303(2) (LexisNexis 2019).[3]

> "Protected purchaser" means a purchaser of a certificated or uncertificated security, or of an interest in the security, who:
>
> (a) gives value;
>
> (b) does not have notice of an adverse claim to the security;
>
> (c) obtains control of the security; and
>
> (d) for a share of stock issued by a land company or a water company:

---

(…continued)
we find it unnecessary to address the issues raised by Big Cottonwood on cross-appeal.

3. Kincaid points out that this version of the statute was not enacted until 2016 and asserts that the district court should have used the less stringent version of the statute in effect in 2010 to determine whether she was a protected purchaser. However, this issue was not raised below, and we find it unnecessary to consider it on appeal, because we agree with the district court that Kincaid was a protected purchaser even under the current version of the statute.

(i) pays, or whose predecessors in interest paid, an assessment levied against the share of stock for at least four of the immediate past seven years by the land company or the water company; or

(ii) has used, or whose predecessors in interest have used, either directly or indirectly, the water available under the share of stock issued by a water company for at least four of the immediate past seven years.

*Id.* § 70A-8-303(1).

¶16 Black Diamond concedes that Kincaid met the first three elements of the protected purchaser definition but asserts that she neither paid assessments nor used the water for seven years prior to learning of Black Diamond's adverse claim. The district court rejected this argument because Rollins and the couple from whom he purchased Lot 25 paid assessments and used the water for seven years prior to Kincaid obtaining the water share.

¶17 Black Diamond asserts that previous owners of Lot 25 cannot be considered Kincaid's predecessors in interest because they held different numbered share stock certificates from Kincaid as a result of Big Cottonwood's practice of revoking old water share certificates and reissuing new certificates to the new owner each time the property was transferred. Because Kincaid's Share Certificate No. 63 was a new certificate, Black Diamond asserts that she had no predecessor in interest.

¶18 But the share stock certificate is not the property itself; rather, it documents an individual's property interest in the share, just as deeds and title certificates document interests in real or personal property. *See Stock Certificate*, Black's Law Dictionary (11th ed. 2019) (defining "stock certificate" as an "instrument *evidencing* ownership of shares of stock" (emphasis

added)); *see also Eisner v. Macomber*, 252 U.S. 189, 208–10 (1920) (explaining that a stock certificate is "but the evidence" of the stockholder's interest and that therefore new stock certificates issued in proportion to the stockholder's previous holdings did not represent a gain to the stockholder); *Linder v. Utah S. Oil Co.*, 269 P.2d 847, 852 (Utah 1954) (explaining that issuing new stock certificates "does not modify the property rights"). Such documents are nearly always issued anew upon transfer of property because they must identify the owner of the property interest by name. *See Issuance by Corporation of New Stock Certificates Without Requiring Surrender of Old*, 61 A.L.R. 436 (1929) (explaining that "[o]ne of the usual requirements in the reissue of corporate stock is the surrender of the old certificate" and that a new certificate "affirms that a designated person is entitled to a certain number of shares of stock," thereby attesting that the person "is an owner and has capacity to transfer the shares"). The fact that Big Cottonwood issued a new share certificate to evidence Kincaid's interest in Lot 25's water share has no more significance to the chain of title than the issuance of a new deed to someone who purchases a home. A property owner's predecessors in interest are those who had a prior interest in the property at issue, not the certificate evidencing the property ownership.

¶19    In this case, there is no question that Share Certificate No. 63 evidenced water rights in Lot 25. Although the certificate did not explicitly refer to Lot 25, Big Cottonwood's bylaws provided for one water share per lot. Shares could not be transferred to other lots, and new share certificates could not be issued until an old one was surrendered or canceled. Share Certificate No. 63 was issued to Kincaid upon the cancellation of Rollins's Share Certificate No. 59, which stated that it was attached to Lot 25. Thus, it is clear that the water share held by Kincaid was the same water share held by the previous owners of Lot 25. Given these circumstances, we agree with the district court that Rollins and the prior owners were predecessors in interest to Kincaid's water share regardless of the fact that they held separate share certificates. Because it is undisputed that Kincaid's predecessors

both paid assessments and used the water from 2003 through 2009, the fourth element of the protected purchaser statute is fulfilled. The district court therefore correctly granted summary judgment in favor of Kincaid on the protected purchaser issue.

## II. The District Court Did Not Exceed Its Discretion in Striking Black Diamond's Supplemental Disclosures

¶20    Black Diamond next challenges the district court's grant of Big Cottonwood's motion to strike its supplemental disclosures. "Rule 26 of the Utah Rules of Civil Procedure requires litigants to make initial disclosures of certain fact witnesses, documents, and other information." *Sleepy Holdings LLC v. Mountain West Title*, 2016 UT App 62, ¶ 12, 370 P.3d 963. Among the required disclosures are "a computation of any damages claimed and a copy of all discoverable documents or evidentiary material on which such computation is based." Utah R. Civ. P. 26(a)(1)(C). In other words, both "the fact of damages and the method for calculating the amount of damages must be apparent in the initial disclosures." *Sleepy Holdings*, 2016 UT App 62, ¶ 14 (quotation simplified). "When a party fails to make timely disclosure, the district court is required to impose discovery sanctions on that party unless the failure to disclose is harmless or the party shows good cause for the failure to disclose." *Bodell Constr. Co. v. Robbins*, 2009 UT 52, ¶ 35, 215 P.3d 933 (quotation simplified).

¶21    In *Sleepy Holdings*, this court considered a similar case in which the district court had granted a defendant's motion to strike the plaintiff's late-filed supplemental disclosures and precluded it from presenting evidence of damages based on those disclosures. 2016 UT App 62, ¶¶ 5–6. The plaintiff asserted that it had timely disclosed its damages theories and calculation because it stated in its complaint that it had entered into a contract "for the sale of twenty (20) lots for the purchase price of $2,000,000." *Id.* ¶ 15 (quotation simplified). This court rejected the plaintiff's assertion because the complaint did "not identify the failed sale as damages or offer a computation or method of

calculating the damages as required by law," *id.* ¶ 17, explaining that "the contract price represents only one element of the damage calculation" for determining "loss of bargain damages," *id.* ¶ 16 (quotation simplified). This court further upheld the district court's determination that the disclosure after fact discovery had closed "would prejudice the defendant, who could no longer conduct discovery to rebut those damage theories." *Id.* ¶ 26.

¶22 Like the *Sleepy Holdings* plaintiff, Black Diamond contends that the damages asserted in the supplemental disclosures had been disclosed before the fact discovery deadline: "Big Cottonwood was made aware of these calculations and damages theories from the outset of the case and through the course of fact discovery . . . ." But Black Diamond's supplemental disclosures asserted two alternative methods of valuation, neither of which was disclosed prior to the supplemental disclosures: (1) an expert calculation of devaluation based on "the value of the property with and without the water share that Big Cottonwood should have issued to plaintiff" and (2) the value of the water share. There is nothing in the complaint, initial disclosures, or Wixom's deposition that would have properly alerted Black Diamond to either of these valuation methods.

¶23 With respect to the first method, Black Diamond points to (1) statements by Wixom in his deposition that he could not occupy or use the property, that he could not "market the property to sell," and that he had been damaged in "several ways" and (2) statements in Black Diamond's complaint that it had "been unable to access water on Lot 25, rendering worthless Lot 25, including the home constructed thereon"; that "Big Cottonwood's actions are precluding Black Diamond from using, enjoying, renting, or selling Lot 25"; and that "Black Diamond's losses also include the funds spent to purchase the property and the value of the property had water been available on the property." But the district court correctly concluded that none of those statements offered adequate notice to Big

Cottonwood of Black Diamond's claimed damages and method of computing them. The only statement that comes close is the last statement that Black Diamond's losses include the money it spent on the property and the value of the property with water rights. But like the parties agreeing to a purchase price of $2 million in *Sleepy Holdings*, the money spent on the property and the property's value with water do not represent every "element of the damage calculation." *See id.* ¶ 16. Black Diamond's supplemental disclosures stated that an expert would calculate devaluation using "the value of the property with *and without* the water share that Big Cottonwood should have issued to plaintiff." (Emphasis added.) But the complaint says nothing about devaluation or how the value of the property without the water share comes into play.

¶24 With respect to the second valuation method, Black Diamond refers to a statement in its complaint that Kincaid had insisted that it purchase her water share for $300,000. Further, Black Diamond cites evidence throughout the record in which Kincaid asserts that the water share is worth $300,000. But Black Diamond's bare statement in its complaint about Kincaid's offer to sell the water share for a certain price was unconnected to any assertion of damages and cannot be construed as a computation. Likewise, Black Diamond cannot rely on Kincaid's statements about the value of the water—statements made by an opposing party—to excuse its obligation to disclose its damages and the method of computing them.

¶25 Black Diamond next asserts that even if it did not timely disclose its damages theories and method of calculating its damages, it should be permitted to proceed because Big Cottonwood was not prejudiced by the late disclosure. Black Diamond argues that even if its disclosures did not comply with rule 26, the vague statements by Wixom regarding his inability to use, enjoy, occupy, and sell the property or to access water should have put Big Cottonwood on notice that Black Diamond intended to pursue damages related to the value of the water and the devaluation of the property. Black Diamond suggests

that Big Cottonwood could have asked Wixom further questions about those alleged damages at the deposition and conducted discovery relating to possible computations that might relate to those damages. But "any ability on the part of [Big Cottonwood] to guess at potential damages does not free [Black Diamond] from its obligation to disclose a computation of damages." *See Keystone Ins. Agency v. Inside Ins.*, 2019 UT 20, ¶ 20, 445 P.3d 434; *see also RJW Media Inc. v. Heath*, 2017 UT App 34, ¶¶ 29–30, 392 P.3d 956 ("An insufficient disclosure by one party does not shift the burden and risk to resolve the insufficient disclosure to the other party . . . ."); *cf. Arreguin-Leon v. Hadco Constr. LLC*, 2018 UT App 225, ¶ 19, 438 P.3d 25 (rejecting the argument that an opportunity for a deposing party "to ask anything it wants to during [a] deposition" removes limitations on the scope of the testimony at trial), *cert. granted*, 455 P.3d 1055 (Utah 2019). Indeed, "[d]isclosure of specific facts and opinions is required so that parties can make better informed choices about the discovery they want to undertake or, just as important, what discovery they want to forgo." *RJW Media*, 2017 UT App 34, ¶ 25. Big Cottonwood could not be expected to devote time and resources to discovery regarding undisclosed damages theories and computations based on conjecture that Black Diamond might like to pursue them down the road.

¶26 Black Diamond also asserts that Big Cottonwood did not need additional fact discovery to defend against its damages claims and that Big Cottonwood could still gather evidence through expert discovery, as that deadline had not yet passed. But Big Cottonwood points to several pieces of fact discovery it would have pursued had it known that Black Diamond intended to seek damages based on the value of the water right or the difference in the value of the property with and without the water right:

> [Big Cottonwood] would have conducted discovery on the availability of water in the area through [Big Cottonwood] and other sources, the ability of Black Diamond to connect to other water

sources, efforts (or the lack thereof) by Black Diamond to obtain water from alternative sources, and the cost of connecting to water from other sources. [Big Cottonwood] would have also explored the existence and value of other properties in the area with and without water shares, the existence of any open market for water shares, and the history of transactions in the area involving water shares.

The district court therefore did not exceed its discretion in concluding that the need for additional fact discovery relating to the undisclosed damages theories would be harmful to Big Cottonwood if the late disclosure were allowed.

### III. The District Court Did Not Err in Granting Big Cottonwood's Motion for Summary Judgment with Respect to Damages

¶27 Finally, Black Diamond asserts that the district court erred in granting Big Cottonwood's motion for summary judgment with respect to damages based on its determination that the damages claimed by Black Diamond were not foreseeable as a matter of law.

¶28 The district court concluded "that there has been no actual harm sustained by Black Diamond because the lack of water for Lot 25 was factored into the purchase price and may have even been used by Black Diamond as a bargaining chip in negotiating the purchase price." "Black Diamond purchased Lot 25 without water, and Black Diamond knew it did not acquire the water share for Lot 25 at the time of the purchase." The court also determined that "[b]ecause Black Diamond purchased Lot 25 without any water share, it was not foreseeable that the purchase by itself would result in rental income from the property unless and until Black Diamond went and found a way to bring culinary water needed for that property."

¶29 We agree with the district court that Black Diamond has not demonstrated that it suffered any damages as a result of Big Cottonwood's breach. Although it may have been foreseeable that an unsuspecting transferee would suffer damage as a result of Big Cottonwood's erroneous transfer of the water right to Kincaid, it was not foreseeable that a transferee who purchased the property with full knowledge of the defect, at a price that took the lack of water rights into account, would suffer damages. And indeed, as the court observed, Black Diamond did not suffer any actual damages as a result of the breach. Essentially, Black Diamond is asking us to classify the windfall it hoped to receive by purchasing the property without a water share and then pursuing a lawsuit to recover the water rights as consequential damages. And like the district court, we are not inclined to do so.

¶30 Many courts have rejected similar damages claims where the plaintiff took title to property with full knowledge of a defect. *See, e.g., Riffle v. United Gen. Title Ins.*, 984 S.W.2d 47, 49–50 (Ark. Ct. App. 1998) (holding that a plaintiff could not recover on a title insurance policy when it had purchased the property with actual notice that the property lacked an easement); *Arden Hills N. Homes Ass'n v. Pemtom, Inc.*, 475 N.W.2d 495, 501 (Minn. Ct. App. 1991) (upholding a trial court's determination that subsequent purchasers with notice of a construction defect were not entitled to a share of the recovery against the developer), *aff'd*, 505 N.W.2d 50 (Minn. 1993); *Jablonsky v. Klemm*, 377 N.W.2d 560, 569–70 (N.D. 1985) (explaining that buyers in a condo association who purchased with knowledge that a retaining wall had failed "consented to the wrongful action by the outsider" and barred themselves from recovery (quotation simplified)); *Meadowbrook Condo. Ass'n v. South Burlington Realty Corp.*, 565 A.2d 238, 241 (Vt. 1989) (holding that individuals who purchased condo units after defects in roads and carports became apparent were not entitled to recover). Such courts reason that "[i]n the absence of evidence to the contrary, the price the subsequent purchasers paid presumably reflected the existence of the patent defect." *Arden Hills*, 475 N.W.2d at 501; *see also Riffle*, 984 S.W.2d

at 50 ("[T]he purchase amount tends to reflect due regard for the problem of access. Appellants received what they bargained for and cannot now claim that they have suffered damages.").

¶31     In this case, it is clear that Black Diamond purchased Lot 25 knowing full well that it did not come with any water share. In fact, Wixom represented at the time, "We understand the risk, we are willing, ready, and able to close on this property right away." Black Diamond knew or should have known that its ability to use the property would be limited by the lack of water and that it would likely be unable to sell or rent the property unless it obtained water from some other source. The fact that Black Diamond hoped to obtain the water rights for Lot 25 through litigation and then failed to do so does not give rise to a claim of damages. Thus, the district court did not err in granting only nominal damages to Black Diamond.

CONCLUSION

¶32     The district court did not err in granting summary judgment in favor of Kincaid because she was a protected purchaser at the time she acquired the water share. Further the district court did not exceed its discretion in striking Black Diamond's supplemental disclosures as untimely. Finally, the district court did not err in granting summary judgment in favor of Big Cottonwood on the issue of damages and awarding only nominal damages to Black Diamond. Accordingly, we affirm.

————————